IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| TEEN CHALLENGE INTERNATIONAL, | ) | |
| NASHVILLE HEADQUARTERS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  3:07-0668 |
| | ) | |
| METROPOLITAN GOVERNMENT OF | ) | Judge Haynes |
| NASHVILLE AND DAVIDSON COUNTY, | ) | Magistrate Judge Knowles |
| | ) | |
| Defendant. | ) | |

**MOTION FOR JUDGMENT AS A MATTER OF LAW
PURSUANT TO FED. R. CIV. P. 50
AND
MOTION TO ALTER OR AMEND OR, IN THE ALTERNATIVE, MOTION FOR
NEW TRIAL PURSUANT TO FED. R. CIV. P. 59**

Comes now the Metropolitan Government and moves for judgment as a matter of law

pursuant to Fed. R. Civ. P. 50 and to alter or amend the judgment or, in the alternative, for a

new trial pursuant to Fed. R. Civ. P. 59. On September 10, 2008, the Court entered its

judgment in this case, which provided as follows:

> In accordance with the jury's verdict, the Plaintiff Teen Challenge
> International, Nashville Headquarters is **AWARDED** nine hundred sixty-
> seven thousand nine hundred ninety five dollars ($967,995) against the
> Defendant Metropolitan Government . . .  Plaintiff is also **AWARDED** its
> attorney's fees and costs to be determined in accordance with Local Rule
> 54.01. Plaintiff is further **AWARDED** prejudgment interest under federal law
> from the date of the filing of this action until the judgment is paid in full.

(Docket no. 111). For the following reasons, the damages awarded to Teen Challenge are

excessive and the verdict should be set aside.

**Argument**

Federal Rule of Civil Procedure 50(b) provides that if a court does not grant a motion for judgment as a matter of law made after the close of all the evidence and the party renews its request after a verdict is returned, the court may: (1) allow the judgment to stand; (2) order a new trial; or (3) direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b). "The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under Rule 50(a)." 9B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2537. A motion under Rule 50 "should be granted . . . only if reasonable minds could not come to a conclusion other than one favoring the movant." Williams v. Nashville Network, 132 F.3d 1123, 1131 (6th Cir. 1997).[1]

Federal Rule of Civil Procedure 59 alternatively authorizes the court to grant a new trial or remit the damages award. The standard for granting a new trial or remittitur is more lenient than the standard for a motion under Rule 50. 9A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2531. "Unlike judgment as a matter of law, a new trial [or remittitur] may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998). Generally, the standard under Rule 59 is met if: (1) the verdict is against the weight of the evidence; (2) the damages are inappropriate as to the

---

[1] The Metropolitan Government made its motion for judgment as a matter of law at the close of Teen Challenge's proof as to Teen Challenge's claim for injunctive relief and Teen Challenge's request for damages for transportation costs, lost personnel costs, and cost of replacement property. Sept. 10, 2008 Tr., pp. 39-43. The Metropolitan Government renewed this motion at the close of all proof. Id., p. 107. The Court denied both motions and Teen Challenge withdrew its request for injunctive relief. Id., pp. 43, 107-08.

amount; or (3) the trial was influenced by bias or prejudice, or was otherwise unfair to the moving party. Holmes v. City of Massillon, Ohio, 78 F.3d 1041, 1045-46 (6th Cir. 1996).

With regard to damages specifically, "[i]f the amount of damages awarded is excessive, it is the duty of the trial judge to require a remittitur or a new trial." Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 65-66 (1966) (emphasis added). To this end, the trial court maintains the discretion to "overturn[] verdicts for excessiveness and order[] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996).

A jury verdict is properly overturned (or remitted) where "it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." Gregory v. Shelby County, 220 F.3d 433, 443 (6th Cir. 2000) (citations and quotation omitted). It is well-established in the Sixth Circuit that a jury verdict should be overturned (or remitted) if it is "(1) beyond the range supportable by proof or (2) so excessive as to shock the conscience . . . or (3) the result of a mistake." Bickel v. Korean Air Lines Co., 96 F.3d 151, 156 (6th Cir. 1996) (citations and quotations omitted); see also Hoskins v. Blalock, 384 F.2d 169, 171 (6th Cir. 1967) (the "decisive question" is "whether there is substantial evidence to sustain the jury's verdict").

This case is unique because, if the Court determines that the evidence was insufficient to support one of Teen Challenge's theories of damages (i.e., lost personnel costs, lost revenues, etc.), the general verdict form does not allow the Court to determine the amount of damages, if any, the jury actually awarded under that theory and remit those damages accordingly. As a result, remittitur is not appropriate in this case, and the Court should order

a new trial. <u>See</u> <u>Biver v. Saginaw T'ship Cmty. Sch.</u>, 1989 WL 74654, * 5 (6th Cir. July 10, 1989) (copy attached) ("because this court is unable to determine, from the verdict form, how much the jury assessed in damages and what legal theories it relied upon, we must order a new trial"); <u>Doherty v. Am. Motors Corp.</u>, 728 F.2d 334, 344 (6th Cir. 1984) (where "jury returned a general verdict, it is impossible to determine" on which claim it based recovery and the verdict "cannot stand") (citations and quotations omitted); Edson R. Sunderland, 29 Yale L.J. 253, 259 (1920) ("The general verdict is either all wrong or all right, because it is an inseparable and inscrutable unit. A single error completely destroys it. But the special verdict enables errors to be localized so that the sound portions of the verdict may be saved and only the unsound portions be subject to redetermination through a new trial.").

Further, in this case, the only "evidence" supporting certain aspects of Teen Challenge's damages claims came in through its expert's (Gregory J. Entwistle, C.P.A.) recitation of facts underlying his expert opinion. Although such "facts" may be considered by Mr. Entwistle in formulating his opinion (and may even be included in his report), this does not relieve Teen Challenge of its burden to prove these facts through substantive evidence at trial. <u>See</u> <u>Engebretsen v. Fairchild Aircraft Corp.</u>, 21 F.3d 721, 728 (6th Cir. 1994) ("Rules 702 and 703 [of the Federal Rules of Evidence] do not, however, permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain"). Absent independent, substantive proof of the facts relied on by Mr. Entwistle, the jury's verdict is without evidentiary support. <u>Id.</u>

**1.    Teen Challenge is not entitled to prejudgment interest and the Court's
award of prejudgment interest should be set aside.**

In its judgment, the Court <u>sua</u> <u>sponte</u> awarded Teen Challenge prejudgment interest on the entire damage award "from the date of the filing of this action until the judgment is paid in full." Docket no. 111.

First and foremost, Teen Challenge is not entitled to prejudgment interest because it was not requested in Teen Challenge's complaint. Docket no. 1; <u>Farber v. Massillon Bd. of Educ.</u>, 917 F.2d 1391, 1401 (6th Cir. 1990) ("prejudgment interest will be allowed as part of the final judgment <u>where a request for same is made in the complaint</u>") (emphasis added); <u>see</u> <u>also</u> <u>Korte v. Diemer</u>, 1992 WL 393159, * 4 (6th Cir. Dec. 28, 1992) (copy attached) (district court properly denied request for prejudgment interest "where there is no explicit request for prejudgment interest in Korte's complaint"). Presumably for this reason, Teen Challenge did not request an instruction to the jury regarding prejudgment interest or otherwise seek an award of prejudgment interest. <u>See</u> <u>e.g.</u>, <u>Barrett v. Detroit Heading, LLC</u>, 2007 WL 1655434, * 12 (E.D. Mich. June 7, 2007) (copy attached) ("If Plaintiff desired prejudgment interest (and an instruction to the jury allowed as much), Plaintiff should have made sure that a specific question about prejudgment interest was on the verdict form and Plaintiff should have told the jury what the appropriate rate was").

Teen Challenge's failure to request prejudgment interest in its Complaint precludes an award of prejudgment interest in this case.

Moreover, even if Teen Challenge had requested prejudgment interest, prejudgment interest is not available for future damages as a matter of law. <u>Ford v. Uniroyal Pension Plan</u>, 154 F.3d 613, 620 (6th Cir. 1998) (award of interest on future benefits would "penalize"

defendant because there is "no lost opportunity to use or invest" the funds where the "plaintiff is not yet entitled to the benefit"); <u>Verdin v. C & B Boat Co., Inc.</u>, 860 F.2d 150, 158 (5th Cir. 1988) ("awards of prejudgment interest on future damages are not available, for the common-sense reason that those damages compensate future harm, for which no interest could possibly have accrued before trial"); <u>Flynn v. Trumbull County, Ohio</u>, 2007 WL 582323, * 2 (N.D. Ohio Feb. 20, 2007) (copy attached) ("Prejudgment interest is compensation for a plaintiff's lost use of funds after his cause of action accrues and before his recovery") (citations and quotations omitted).

In this case, the jury awarded Teen Challenge an unspecified amount of future damages. Pl.'s Ex. 13, Ex. N; Docket no. 111.[2] The general verdict form (which did not request separate awards for past and future damages) does not allow the Court to determine the precise amount of future damages awarded to Teen Challenge by the jury [3] Because it is impossible to ascertain what portion of the jury's award is for future damages, Teen Challenge cannot recover prejudgment interest on the verdict. <u>Biver</u>, 1989 WL 74654 at * 5; <u>Hoskins</u>, 384 F.2d at 171.

>    2.    **The jury's award of future damages was not reduced to present value and should be set aside.**

As stated above, the jury awarded Teen Challenge up to $266,753 in future damages. Docket no. 111; Pl.'s Ex. 13, Ex. N. Teen Challenge failed to establish its future damages with reasonable certainty because it failed to reduce this amount to present value.

---

[2] Teen Challenge requested $866,724 in past damages $266,753 in future damages ($1,133,477 total). Pl.'s Ex. 13, Ex. N. The jury awarded Teen Challenge $967,995. Docket no. 111.

[3] Teen Challenge did not request a verdict form or interrogatories delineating between awards for past and/or future damages. The Metropolitan Government requested that the verdict form be itemized to include each theory of damages sought by Teen Challenge. Sept. 10, 2008 Tr., pp. 107, 112. The Metropolitan Government's request was denied. <u>Id.</u>

The Supreme Court has explained:

> Awarding prejudgment interest and discounting to present value are really two sides of the same coin. For precisely the same reason that a given sum of money in hand is worth more than the like sum of money payable in the future [thus requiring future damages to be reduced to present value], a given sum of money in hand is worth less than the like sum of money had it been paid in the past [thus requiring a payment of interest].

Monessen Southwestern Ry. Co. v. Morgan, 486 U.S. 330, 348 (1988). Recognizing this principle, "[i]t is settled law in [the Sixth] Circuit that an award of future damages must be reduced to present value in order to take into account the earning power of the money." Rodgers v. Fisher Body Div., Gen. Motors Corp., 739 F.2d 1102, 1106 (6th Cir. 1984).

In this case, Teen Challenge failed to produce any evidence (expert or otherwise) as to the present value of its asserted $266,753 in future damages. 25A C.J.S. *Damages* § 381 ("Given the complexity of the modern economic environment, the reduction of future damages to present value must be based upon specific economic evidence and not merely upon personal knowledge the jury may or may not possess"); see also Metz v. United Technologies Corp., 754 F.2d 63, 68 (2d Cir. 1985) ("failure to include any present value adjustment renders the calculations mathematically inaccurate and constitutes substantial and prejudicial error to the defendant"); Hutton v. Essex Group, Inc., 885 F. Supp. 331, 334 (D.N.H. 1994) ("the plaintiff bears the burden of coming forward with evidence of the proper rate of discounting. It is axiomatic that the plaintiff must prove her damages to a degree of reasonable certainty and she cannot satisfy that burden without evidence of the amount of future damages reduced to present value").

As a result, the jury's award of up to $266,753 in future damages cannot stand. Chonich v. Wayne County Cmty. Coll., 874 F.2d 359, 369 (6th Cir. 1989) ("The failure to

instruct the jury to reduce to present value any reasonably demonstrated loss of future earnings fatally infects [the] jury award") (citations and quotations omitted).[4] The verdict should be set aside. Biver, 1989 WL 74654 at * 5.

**3.      The jury's award for lost revenue damages is based on speculation and must be set aside because Teen Challenge failed to account for expenses.**

In this case, the jury awarded Teen Challenge up to $355,523 for asserted lost revenues. Pl.'s Ex. 13, p. 7-8, 11.[5] Teen Challenge's request for lost revenues was based on the theory that, had it been able to occupy the Baker Road property, it would have been able to enroll additional students into the program who would have paid tuition. Pl.'s Ex. 13, p. 7 ("Teen Challenges [sic] was damaged to the extent of the lost tuition they would have received from new students had they been allowed to occupy the property on a timely basis net of additional variable costs"); Sept. 9, 2008 Tr., p. 139 (same). This portion of the jury's award should be reversed because Teen Challenge failed to properly account for expenses associated with the additional students that Teen Challenge did not incur.

It is well-established that a recovery for lost revenues must be based on net lost revenues, after a deduction for appropriate expenses. Cecil Corley Motor Co., Inc. v. Gen. Motors Corp., 380 F. Supp. 819, 854 (M.D. Tenn. 1974) ("An award of damages for lost

---

[4] Neither party requested a jury instruction that Teen Challenge's damages be reduced to present value. The Sixth Circuit has held on numerous occasions that a failure to instruct the jury to reduce future damages to present value is "plain error" and the damages award should be set aside even in the absence of such a request. Chonich v. Wayne County Cmty. College, 874 F.2d 359, 369 (6th Cir. 1989) ("The failure to instruct the jury to reduce to present value any reasonably demonstrated loss of future earnings fatally infects this jury award. . . we find the omission in this case to be 'plain error'"); Rodgers v. Fisher Body Div., General Motors Corp., 739 F.2d 1102, 1106 (6th Cir. 1984) (failure to instruct jury to reduce future damages to present value "was obvious and it affected the fairness and integrity of the judicial process"); see also Metz v. United Technologies Corp., 754 F.2d 63, 65 (2d Cir. 1985) (failure to instruct jury "to discount all awards for future lost dollars to their present value . . . is plain error").

[5] Specifically, Teen Challenge requested $176,125 in lost past revenues and $179,398 in lost future revenues. Pl.'s Ex. 13, pp., 7-8, 11, Ex. N.

profits must be based on net profits"); see also Sure-Trip, Inc. v. Westinghouse Eng'g, 47 F.3d 526, 531-32 (2d Cir. 1995) ("variable expenses . . . must be deducted from plaintiff's recovery so plaintiff is not put in a better position than it would have been had defendant performed"); Chavez Properties-Airport Parking Albuquerque, LP v. Lorentzen, 204 Fed. Appx. 745, 757 (10th Cir. 2006) ("Lost profits are, by their definition, the receipts or income one would receive after expenses are deducted"). The burden is on Teen Challenge to prove its lost revenues with reasonable certainty, including a proper accounting of expenses that would have been incurred had Teen Challenge increased its enrollment by moving onto the Baker Road property. See Sure-Trip, 47 F.3d at 532 (plaintiff bears burden of proof of lost profits and, therefore, is required "to produce evidence regarding its increased costs" that were not incurred).

Recognizing these principles, Teen Challenge's expert deducted from his calculation of Teen Challenge's lost revenues certain operating expenses that Teen Challenge saved when it was unable to increase its enrollment. Pl.'s Ex. 13, p. 7 ("This lost revenue should be reduced by the variable cost associated with the additional students"); Sept. 9, 2008 Tr., p. 140 (same). While certain minimal expenses were deducted,[6] Mr. Entwistle completely ignored other significant expenses that would have greatly reduced Teen Challenge's lost revenue recovery.

For instance, Mr. Entwistle failed to deduct Teen Challenge's utility costs from his lost revenue calculation. Sept. 10, 2008 Tr., pp. 23-24. He did so based on Ms. Calhoun's speculation that because the Baker Road house was newer than Teen Challenge's existing

---

[6] The only variable costs accounted for by Mr. Entwistle were $102.01 annual cost per student for curriculum and $15,000 for a new staff person. Pl.'s Ex. 13, p. 7; Sept. 9, 2008 Tr., pp. 140-41.

accommodations, she believed that its utility costs would not substantially increase. Id. Mr. Entwistle improperly relied on Ms. Calhoun's speculation because, as Ms. Calhoun herself admitted, this was "a little bit of a guess on [Teen Challenge's] part." Sept. 9, 2008 Tr., p. 104. Respectfully, Ms. Calhoun's "speculation and guesswork" is insufficient to justify Mr. Entwistle's failure to account for increased utility expense in his lost revenue analysis. Blue Diamond Coal Co. v. United Mine Workers of Am., 436 F.2d 551, 561 (6th Cir. 1970) ("Lost profits are not recoverable when based upon sheer speculation and guesswork") (citations and quotations omitted).

Mr. Entwistle also acknowledged that Teen Challenge's "program services" expenses (which were more than $15,000 without the anticipated new students) would have increased as Teen Challenge increased its enrollment. Sept. 10, 2008 Tr., pp. 26-27; Def.'s Ex. 1. Despite this recognition, Mr. Entwistle failed to account for these expenses in calculating Teen Challenge's asserted lost revenues. Id.

Mr. Entwistle also failed to account for additional insurance costs Teen Challenge would have incurred had it moved to the Baker Road property and increased its enrollment. Sept. 10, 2008 Tr., p. 28. Teen Challenge's own proof, however, conclusively establishes that it would have incurred increased insurance costs once it moved onto the Baker Road property; Teen Challenge explicitly sought to recover from the Metropolitan Government $2,262 for flood insurance on the Baker Road property. Pl.'s Ex. 13, p. 5; Sept. 9, 2008 Tr., p. 134.[7] Given Teen Challenge's request for damages for insurance on the Baker Road

---

[7] The same paradox is also present with Teen Challenge's refusal to account for interest and utility expenses in its lost revenue analysis while still seeking to recover damages for these expenses from the Metropolitan Government. See, e.g., Pl.'s Ex. 13, p. 5, Ex. D.

property, Mr. Entwistle's hypothesis that insurance costs would not have increased is specious, at best.

Finally, the most striking example of the speculative nature of Teen Challenge's asserted lost revenue is Teen Challenge's failure to account for its mortgage expense on the Baker Road property. Pl.'s Ex. 13, p. 7-8; Sept. 10, 2008 Tr., pp. 13-14. On cross-examination, Mr. Entwistle attempted to justify his failure to account for Teen Challenge's mortgage expense by characterizing it as a "capital expense." Sept. 10, 2008 Tr., p. 13 ("I consider that [Teen Challenge's $4,500 monthly mortgage payment] to be a capital item"); Id., p. 17 (Teen Challenge's $4,500 mortgage payment is "part of the development of capital"); Id., p. 16.

Mr. Entwistle is correct that only operating (or variable) expenses,[8] not capital expenses, are properly included in the lost revenue equation. Chavez Properties, 204 Fed. Appx. at 757 ("A basic principle of accounting is that profits are determined only after operating expenses are deducted from income"). Mr. Entwistle is also correct that the typical mortgage payment represents some degree of capital expense. See United States v. 1461 West 42nd Street, Hialeah, Fla., 251 F.3d 1329, 1336 (11th Cir. 2001) ("mortgage payments constitute both an ordinary operating expense – payment of interest – and a capital expense – payment going toward equity").

The problem for Teen Challenge is that Mr. Entwistle's characterization of Teen Challenge's mortgage payments as a capital expense is invalid because Teen Challenge's

---

[8] For purposes of Mr. Entwistle's expert opinion, the terms "variable" expense and "operating" expense are synonymous. LaPeer County Med. Care Facility v. State of Mich., 1992 WL 220917, * 3 (W.D. Mich. Feb. 4, 1992) (copy attached) ("variable cost component essentially reflects the facilities' operating costs, as opposed to fixed costs"); Sept. 10, 2008 Tr., p. 23 (Mr. Entwistle agreeing that variable costs were same as operating costs).

mortgage was **interest-only**. Pl.'s Ex. 12, Tab 1, Transaction History for Volunteer State Bank (reflecting interest-only mortgage); Sept. 9, 2008 Tr., p. 94 (Norma Calhoun testifying as to interest-only payments). Teen Challenge's interest-only mortgage is an operating expense, not a capital expense, and should have been deducted from Teen Challenge's asserted lost revenues. 1461 West 42nd Street, 251 F.3d at 1336 (payment of interest on mortgage constitutes "an ordinary operating expense").

Perhaps recognizing this flaw in his analysis, on cross-examination Mr. Entwistle offered an alternative justification for his failure to deduct these payments from Teen Challenge's lost revenue. Specifically, Mr. Entwistle postulated that this expense would be paid by some unidentified individual making an unspecified donation.[9] Sept. 10, 2008 Tr., p. 14 (Mr. Entwistle stating that "it has to do with contributions that might come"); Id., p. 17 (Mr. Entwistle stating that mortgage expense might not have been incurred because it "is a possibility that [Teen Challenge] would have raised money in the form of contributions").[10]

A similar attempt to exclude operating expenses from a computation of lost revenues was rejected by this Court in Cecil Corley Motor Co. v. Gen. Motors Corp., 380 F. Supp. 819 (M.D. Tenn. 1974). In that case, the plaintiff sought to prove lost profits based on lost car sales. Cecil Corley Motor Co., 380 F. Supp. at 855. The plaintiff's expert attempted to avoid deducting operating expenses from his calculation on the theory that "the additional profits

---

[9] Mr. Entwistle's "unspecified donor" theory is not contained in his expert report and was only provided under cross-examination by the Metropolitan Government. Because Mr. Entwistle failed to disclose this theory in his expert report, it should not be considered by the Court as a basis for upholding the jury's damage award. Local Rule, § 39.01(c)(6)c.

[10] No damages for lost donations are pled in Teen Challenge's complaint. Docket no. 1. Teen Challenge's counsel represented to the Court that Teen Challenge was not seeking damages for lost donations. Sept. 9, 2008 Tr., p. 110. Despite this representation, Teen Challenge improperly seeks to hold the Metropolitan Government liable for unspecified (and unpled) lost donations through the "back-door" by using them as a basis to artificially inflate its lost revenues.

generated by the parts and service departments would off-set any additional expenses." Id. at 856. The Court rejected the plaintiff's expert's analysis because plaintiff was unable to offer any proof that "these additional expenses would be offset by additional gross profits generated by the parts and service departments[.]" Id. As a result, the Court found that "the damage theory proffered by plaintiff is wholly inadequate and insufficient to support any award by the jury" and set aside the jury's damage award. Id. at 858.

Like the expert in Cecil Corley Motor Co., Mr. Entwistle claimed that he was not required to deduct Teen Challenge's interest-only mortgage expense from its asserted lost revenues because certain unspecified donations would off-set this expense. Sept. 10, 2008 Tr., pp. 14, 17.  Like the expert in Cecil Corley Motor Co., Mr. Entwistle was unable to identify any proof that Teen Challenge would have obtained a single donation covering any of its interest-only mortgage expense; in fact, Mr. Entwistle and Ms. Calhoun both acknowledged that their belief that an unspecified donor would pay this expense was purely speculative. Sept. 9, 2008 Tr., p. 107 (Ms. Calhoun acknowledging that "you cannot plan on" such donations and "[y]ou cannot budget for that"); Sept. 10, 2008 Tr., p. 14 (Mr. Entwistle acknowledging "I could not find any basis to project the amount of contributions that the organization did not get as a result."); Id., p. 19 (Mr. Entwistle acknowledging that "I couldn't find any reliable basis to project what kind of contributions they might have received.").[11]  As a result, Teen Challenge's proof of lost revenues is "wholly inadequate and

---

[11] Ms. Calhoun testified that she had almost completed an application for a $100,000 grant in anticipation of moving onto the Baker Road property. Sept. 9, 2008 Tr., p. 87.  According to Ms. Calhoun the purpose of this grant was to complete the "Phase 1" renovations to the property, not payment of Teen Challenge's mortgage. Id. As a result, this grant provides no support to Mr. Entwistle's "unspecified donor" theory because the grant was not earmarked for Teen Challenge's interest-only mortgage payment.

insufficient to support any award by the jury" and the jury's damage award should be set aside. <u>Cecil Corley Motor Co.</u>, 380 F. Supp. at 858.

In sum, Teen Challenge's failure to recognize the "basic principle of accounting . . . that profits are determined only after operating expenses [<u>i.e.</u>, interest, utility, and insurance expenses] are deducted from income" renders its lost revenue damages (past and future) fatally speculative. <u>Chavez Properties</u>, 204 Fed. Appx. at 757; <u>Cecil Corley Motor Co.</u>, 380 F. Supp. at 856 ("The first, and perhaps most serious, defect" with plaintiff's damages calculation was its failure to account for "additional expenses" that would have been incurred).[12] If the verdict for Teen Challenge is allowed to stand it "would be a legally unjustified windfall to the plaintiff and a miscarriage of justice." <u>Cecil Corley Motor Co.</u>, 380 F. Supp. at 827. The verdict should be set aside. <u>Biver</u>, 1989 WL 74654 at * 5.

**4.    The jury award for lost revenues based on 28 additional students is not supported by the record and must be set aside.**

In addition to Teen Challenge's failure to deduct expenses from its asserted lost revenue, the jury's lost revenue award also lacks evidentiary support because it is based on 28 additional students, not 16.[13] As discussed above, Teen Challenge's lost revenue theory of damages is based on lost tuition resulting from its inability to occupy the Baker Road property. Pl.'s Ex. 13, p. 7; Sept. 9, 2008 Tr., p. 139.

---

[12] The items discussed above are just a sampling of expenses that Mr. Entwistle failed to take into account. He also testified that he did not account for other expenses that had been claimed by Teen Challenge in 2005 (the year prior to its purchase of the Baker Road property) such as "student need" or "staff" expenses. Sept. 10, 2008 Tr., p. 28; Def.'s Ex. 1.

[13] In Exhibit N and J to his expert report, Mr. Entwistle identified $176,125 in lost past revenues. Pl.'s Ex. 13, Exs. J, N. This was confirmed by Mr. Entwistle's testimony. Sept. 9, 2008 Tr., p. 141. Mr. Entwistle's expert report, however, stated "that Teen Challenge has been damaged in the amount of $282,155 due to its [past] loss of revenue." Pl.'s Ex. 13, p. 8. Because the jury was provided a general verdict form, it is not possible to determine what amount the jury awarded Teen Challenge – $282,155, $176,125, or some other amount – for lost past revenues.

Mr. Entwistle based his calculation of the amount of Teen Challenge's lost revenues on the underlying "facts" that "Teen Challenge had planned upon completion of the new facility to house 30 male and 16 female students [total of 46 students], an increase of 18 male and 10 female students." Pl.'s Ex. 13, p. 4; Sept. 9, 2008 Tr., p. 129. Mr. Entwistle, therefore, based his lost revenue calculation on his stated belief that the purchase of the Baker Road property would have allowed Teen Challenge to add a total of 28 new students (and their resulting revenues) to the program. Pl.'s Ex. 13, pp. 4, 7; Sept. 9, 2008 Tr., pp. 129, 139.

The underlying "facts" relied on by Mr. Entwistle, however, were contradicted by the testimony of Ms. Calhoun. Ms. Calhoun testified that Teen Challenge planned to increase enrollment by only 16 students (12 less than the number relied on by Mr. Entwistle). Specifically, Ms. Calhoun testified that prior to the purchase of the Baker Road property, Teen Challenge had 6 female students and 12 male students (18 total students). Sept. 9, 2008 Tr., pp. 75, 92, 97. When Teen Challenge purchased the Baker Road property it intended to house 10 additional female students (16 total female students) and 6 additional male students (18 total male students) – an increase of 16 students over its prior enrollment. Sept. 9, 2008 Tr., p. 92 (Ms. Calhoun stating that Teen Challenge intended to use the Baker Road property to house the six female students that were already in the program "[p]lus ten more"); p. 97 (Ms. Calhoun stating that Teen Challenge was "planning to have 18" men housed on the Baker Road property). In total, Ms. Calhoun testified that Teen Challenge intended to house 34 students (18 previously-enrolled and 16 new students) on the Baker Road property. Sept. 9, 2008 Tr., p. 98 (Ms. Calhoun agreeing that Teen Challenge was "looking at something around 34 people on that property in terms of students"), p. 97-98 (Ms. Calhoun agreeing

that Teen Challenge intended to house 16 female students and 18 male students at the Baker Road property for a total of 34 students).

In sum, the anticipated increased enrollment relied on by Mr. Entwistle (28 new students) was much more ambitious than Teen Challenge's actual plans (16 new students), as Ms. Calhoun testified. There is not a shred of substantive evidence that Teen Challenge intended to expand its programs by 28 new students; the only mention of this number was provided by Mr. Entwistle. Engebretsen, 21 F.3d at 728-29 (expert's testimony as to facts underlying his opinion only "explain[s] the basis of the expert's opinion" and is not considered "substantive evidence"). As a result, Mr. Entwistle's lost revenue calculation is patently inaccurate and cannot support the jury's verdict as a matter of law. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict").

The verdict should be set aside. Biver, 1989 WL 74654 at * 5.

**5.     The jury's award for additional transportation costs is not supported by the evidence and must be set aside.**

Mr. Entwistle also testified that Teen Challenge suffered damages in the form of additional transportation costs – past and future – in the amount of $7,008 ($4,544 past and $2,464 future). Pl.'s Ex. 13, p. 8, 11, Ex. N; Sept. 9, 2008 Tr., p. 143. Underlying Mr. Entwistle's expert opinion was his belief that, when Teen Challenge was unable to use the Baker Road property to consolidate its operations, Teen Challenge was required to make three additional trips per week for student's class work and one additional trip per week for

chapel services. Pl.'s Ex. 13, p. 8; Sept. 9, 2008 Tr., p. 141. Mr. Entwistle also relied on Ms. Calhoun's "calculat[ion] that the two vans traveled 10,208 miles in the first five months of 2008 and that at least 10% of that travel would not be incurred if the students were centrally located." Pl.'s Ex. 13, p. 8; Sept. 9, 2008 Tr., p. 142.

Mr. Entwistle's expert report and testimony is the sole mention of these facts in the record.[14] As discussed above, Mr. Entwistle's testimony as to the facts underlying his opinion only "explain[s] the basis of [his] opinion" and is not considered "substantive evidence." Engebretsen, 21 F.3d at 728-29.

Because there is no substantive proof in the record of the facts supporting plaintiff's damages for additional transportation costs, the verdict should be set aside. Biver, 1989 WL 74654, * 5.

6. **The jury's award for additional personnel costs is not supported by the record and must be set aside.**

Mr. Entwistle testified that Teen Challenge suffered damages for "additional personnel costs" incurred by Teen Challenge in the amount of $60,225 – $38,325 (past costs) plus $21,900 (future costs). Pl.'s Ex. 13, p. 9, 12, Ex. N. Mr. Entwistle based his opinion on the following underlying facts:

> The Executive Director and Chief Financial Officer of Teen Challenge earned $45,000 and $29,543 respectively during 2007. Additionally, the Executive Director has concluded that $5,000 of other staff salaries are consumed traveling between the facilities each year. The Executive Director has concluded that 20% of the time is taken traveling to the various locations. I have added a 10% benefit cost to the total lost wage cost from period October 1, 2006 to the date of this report.

---

[14] Ms. Calhoun testified that Teen Challenge was required to transport students between facilities. Sept. 9, 2008 Tr., pp. 70-71. She did not testify how often these trips were made, how far apart the locations were, or how many total miles it traveled between these locations during any specified period of time. Id.

Pl.'s Ex. 13, p. 9; Sept. 9, 2008 Tr., p. 143.

Teen Challenge introduced documents establishing the salaries for Ms. Calhoun and Sherry Farless.[15] Pl.'s Ex. 12, Tab 5. Teen Challenge did not put on <u>any</u> evidence supporting Mr. Entwistle's assertion that these employees needlessly spent 20% of their time traveling between locations, spent $5,000 on other staff salaries, etc.[16] The only "source" of these critical facts is Mr. Entwistle's report. Again, Mr. Entwistle's recitation of the underlying facts is not substantive evidence. <u>Engebretsen</u>, 21 F.3d at 728-29 (6th Cir. 1994).

Because there are no substantive facts in the record supporting this theory of recovery, the verdict should be set aside. <u>Biver</u>, 1989 WL 74654 at * 5.

7.    **The jury's award for the cost of acquiring replacement property is based on speculation and must be set aside.**

The jury also awarded Teen Challenge up to $400,000 for the cost of purchasing replacement property. Docket no. 111; Pl.'s Ex. 13, Ex. N. This portion of the jury's award should be set aside.

First, allowing Teen Challenge to recover these costs results in an unjustified windfall to Teen Challenge. As a general rule, when a municipality's zoning code unlawfully deprives a private party of the use of its property, the measure of damages is the value of the loss of the use of the property, such as revenues lost as a result of the zoning change. See <u>Siegmond v. Fedor</u>, 2004 WL 1490430, * 5 (M.D. Pa. June 29, 2004) (copy attached) (in Section 1983 case related to zoning appeal "damages may properly be measured by the value of the loss

---

[15] Although there was no testimony to this effect, presumably Ms. Farless is the Chief Financial Officer referred to by Mr. Entwistle.

[16] Ms. Calhoun's testimony on this subject was limited to her testimony that Teen Challenge employees were required to "continue[] to have to go back and forth between all of these locations as well as spending much, much extra time . . . trying to get everything ready . . . " Sept. 9, 2008 Tr., p. 87.

of use of property. For example, an inability to use a property as a landfill causes measurable damages in the form of lost profits."). In this case, Teen Challenge has already recovered its lost revenues. See supra §§ 3, 4; Pl.'s Ex. 13, pp. 7-8, 11. Teen Challenge has also recovered other damages for losses it sustained as a result of its inability to use the Baker Road property. See e.g., Pl.'s Ex. 13, p. 5-6, Ex. C-F.

Having been compensated for these losses, an additional award of damages in the form of "cost of replacement property" is an impermissible windfall to Teen Challenge. When Teen Challenge purchased the Baker Road property it made a down payment of $160,000 and interest-only mortgage payments on the outstanding balance. Sept. 9, 2008 Tr., p. 94; Pl.'s Ex. 12, Tab 1, Transaction History for Volunteer State Bank (reflecting interest-only mortgage). When Teen Challenge uses the $400,000 awarded by the jury to purchase one of the identified "replacement properties," it will have $400,000 of "built-in" equity in that property at no cost to Teen Challenge. In other words, Teen Challenge will spend $1,400,000 of its own money and purchase property worth $1,800,000. This is an impermissible windfall of $400,000 to Teen Challenge.

The flaw with plaintiff's "replacement property" damages theory is also evidenced by Mr. Entwisle's acknowledgement that "the Baker Road property was back on the market for about the same price that it was two years ago" when Teen Challenge sold it. Sept. 10, 2008 Tr., p. 30. If the very property Teen Challenge seeks to use is available for purchase for "about the same price" it received two years ago, an award of $400,000 to Teen Challenge for comparable "replacement property" is windfall. Teen Challenge does not need to buy

property that is $400,000 more expensive to be made whole; it can be made whole by buying back the same property for "about the same price."

Finally, even if some viable damages theory entitled Teen Challenge to this windfall, Teen Challenge's comparison of properties is speculative. In support of this theory of damages, Mr. Entwistle opined that a similar property ("The Nashville Metro Property") and necessary improvements would cost Teen Challenge $1,950,000 as compared to the Baker Road property, which after improvements would have cost $1,550,000. Pl.'s Ex. 13, p. 11. From this, Mr. Entwistle arrived at his total "replacement property" damages figure of $400,000. Pl.'s Ex. 13, p. 11. The problem for Teen Challenge is that the Nashville Metro Property is not a "comparable" property because it is zoned residential and therefore is not available for Teen Challenge's proposed use. Pl.'s Ex. 13, p. 10; Sept. 9, 2008 Tr., p. 89. [17] This element of damages is speculative and the verdict should be set aside. Biver, 1989 WL 74654 at * 5.

## Conclusion

The jury verdict is not supported by the evidence at trial, is based on speculative proof of damages, and results in a windfall to plaintiff. As a result, plaintiff's recovery for the following damages should be set aside:

- Prejudgment interest (supra, § 1)

- Future damages in the amount of $266,753 (supra, § 2)

- Lost revenues (past and future) in the amount of $355,523 (supra, § § 3, 4)

---

[17] The second comparator property identified by Teen Challenge does not support Teen Challenge's "replacement property" damages computation. Its purchase price is $1,800,000, with no amount specified for improvements. Pl.'s Ex. 13, p. 10. Had Mr. Entwistle based his analysis on this "comparable" property, Teen Challenge could recover at most $250,000 – $1,800,000 minus $1,550,000 (Total Estimated Cost of Baker Road Property) – not $400,000 as requested by Teen Challenge.

- Additional transportation costs (past and future) in the amount of $7,008 (<u>supra</u>, § 5)

- Additional personnel costs (past and future) in the amount of $60,225 (<u>supra</u>, § 6)

- Replacement property costs in the amount of $400,000 (<u>supra</u>, § 7)

Because the general verdict form does not allow the Court to determine the amount of damages, if any, the jury actually awarded under any particular theory, remittitur is not appropriate in this case, and the Court should order a new trial.

THE DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY
Sue B. Cain, #9380, Director of Law

s/James W. J. Farrar
Francis H. Young # 16554
James W.J. Farrar #22782
Assistant Metropolitan Attorneys
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341

### Certificate of Service

I hereby certify that a copy of the foregoing has been forwarded electronically to Larry D. Crain, Esq., and Abigail Southerland, Esq., 5214 Maryland Way, Suite 402, Brentwood, Tennessee 37027 on this 24th day of September, 2008.

s/James W. J. Farrar
James W. J. Farrar