# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| JESSICA A., NIKKI C., and BEN C., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| vs. | ) | Case No. 3:07-0668 |
| | ) | |
| | ) | |
| | ) | Judge Haynes |
| | ) | Magistrate Judge Knowles |
| METROPOLITAN GOVERNMENT OF | ) | |
| NASHVILLE AND DAVIDSON COUNTY, | | |
| TENNESSEE | ) | |
| **Defendant.** | ) | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO ALTER OR AMEND OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

---

Comes now the Plaintiff, TEEN CHALLENGE INTERNATIONAL, NASHVILLE HEADQUARTERS, by and through counsel, and submits this Memorandum of Law in Opposition to Defendant's Motion to Alter or Amend or, in the Alternative, Motion for New Trial Pursuant to Fed. R. Civ. P. 59, and would state as follows:

### ARGUMENT

### I. Legal Standards

A Rule 50(b) renewed motion for judgment as a matter of law should be granted only when, "if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Ford v. County of Gran Traverse*, 535 F.3d 483, 494 (6th Cir. Mich. 2008) (citing *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003). "In other

words, '[t]he motion may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence. An appeals court is not to weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.'" *Ford*, 535 F.3d at 494 (citing *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 544 (6th Cir. 2003)).

Federal Rule of Civil Procedure 59, provides in relevant part that "[a] new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." FED R. CIV. P. 59(a). The scope of review of a damage award pursuant to Rule 59 is extremely narrow. *Bell v. Johnson*, 404 F.3d 997, 1002 (6th Cir. 2005) (citing *Walker v. Bain*, 257 F.3d 660, 674 (6th Cir. 2001)). Courts agree that a Rule 59 motion is proper only "**when, after reviewing all of the evidence in the light most favorable to the prevailing party**, it [the court] is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." *American Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) (emphasis added).

A trial court's decision to grant or deny a new trial under Rule 59 is reviewed for abuse of discretion only. *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 435 (1996) ("We must give the benefit of every doubt to the judgment of the trial court"). Trial courts are granted broad discretion especially with regards to review of a jury verdict and will be reversed only if there is a mistake or the award "shocks the conscience." *Bell*, 404 F.3d at 1003 ("Since there is no basis for concluding that the factfinders made 'mistakes' either in their findings or their arithmetic, if any, we will reverse the district court and remit these awards only if they 'shock the

conscience'"). The Sixth Circuit, in *Hoskins v. Blalock*, 384 F.2d 169 (6th Cir. 1967), explained

the reason for such broad discretion:

> It is the jury's responsibility to fix the award of damages and their decision is not
> subject to interference by the trial judge unless so excessive as to be indicative of
> prejudice, passion, partiality, or corruption on the part of the jury; also, that,
> absent abuse of discretion or clear mistake, the judgment of the judge who
> presided at the trial that a verdict was not excessive will control. The same rule
> stated in different words was approved by Judge Phillips speaking for this Court
> in the more recent case of *Coursey v. Morgan Driveway, Inc.*, 366 F.2d 504, 508
> (1966): 'The amount of damages is primarily for the jury to determine, and next
> to the jury the most competent person to pass on the matter is the judge who
> presided at the trial and heard the evidence, and after he has approved the verdict
> it is not for us to substitute our judgment for his or the jury's, but it is our duty not
> to disturb the verdict unless it is plainly so unreasonable as to shock the judicial
> conscience.'

*Id.* at 170 (citations omitted). Thus, "if the verdict is supported by some competent, credible

evidence, the court will be deemed not to have abused its discretion in denying the motion." *Bell*

*v. Johnson*, 404 F.3d at 1002. *See e.g., American Trim, L.L.C.*, 383 F.3d at 47 ("If there is any

credible evidence to support a verdict, it [the motion] should be set aside").


## II. Defendant Is Not Entitled To Any of the Requested Relief Under Fed. R. Civ. P. 50 and 59.

### A. *Teen Challenge is entitled to prejudgment interest and the Court's award should be upheld.*

The Sixth Circuit has explained that trial courts have wide discretion in awarding

prejudgment interest. "The rule of our circuit seems to be that an award of prejudgment interest

should stand in the absence of an abuse of discretion." *EEOC v. Wooster Brush Co. Employees*

*Relief Ass'n*, 727 F.2d 566, 578 (6th Cir. 1984) (citing *Bricklayers Pension Trust Fund v.*

*Taiariol*, 671 F.2d 988 (6th Cir. 1982) (explaining that courts have especially wide discretion to

restore aggrieved person to where they would have been were it not for unlawful

discrimination"). Thus, the Sixth Circuit "will not reverse the district court's decision unless [it] ha[s] a definite and firm conviction that the trial court committed a clear error of judgment." *Century Bus. Servs. V. Utica Mut. Ins. Co.*, 122 Fed.Appx. 196, 204 (6th Cir. 2005) (citing *Paschal v. Flagstar Bank*, 297 F.3d 431, 434 (6th Cir. 2002)). (A copy is attached hereto as Exhibit 1.)

The purpose of an award of prejudgment interest is to "compensate a deserving party for 'loss of the use' of its funds." *Union Planters Bank, N.A. v. Cont'l Cas. Co.*, 478 F.3d 759, 767 (6th Cir. 2007). Defendant errs in suggesting that Teen Challenge is not entitled to prejudgment interest because it did not request it in the complaint. Docket no. 112, at 5. *See Colunga v. Young,* 722 F. Supp. 1479, 1485 (W.D. Mich. 1989) ("Although plaintiffs have not specifically requested such [prejudgment] interest, their claim has not been waived") (citing *Bowers v. Firestone Tire and Rubber Co.*, 800 F.2d 474, 478-79 (5th Cir. 1986)).

Nonetheless, Defendant cites *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391 (6th Cir. 1990), to support such an assertion. The court in *Farber* explained that "**pursuant to Fed. R. Civ. P. 54(c)**, prejudgment interest will be allowed as part of the final judgment where a request for same is made in the complaint." 917 F.2d at 1401 (citing *Shearson/American Express, Inc. v. Mann*, 814 F.2d 301, 307 (6th Cir. 1987)[1] (emphasis added). Fed. R. Civ. P. 54(c), however, clearly explains that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, **even if the party has not demanded such relief in the party's pleadings**." Thus, a requirement that prejudgment interest must be specifically requested in the complaint contradicts Rule 54(c). *See Campbell, Athey & Zukowski v. Thomasson,* 863 F.2d 398, 402 (5th Cir. 1989) ("**because federal law governs the sufficiency of pleadings, it is**

---

[1] This case, cited by the *Farber* court, does not mention any requirement that prejudgment interest must be requested in the complaint. *Shearson/American Express*, 814 F.2d at 307.

**unnecessary for a plaintiff to make a specific prayer for prejudgment interest**") (emphasis added).

Regardless, Teen Challenge's prayer for relief includes a request for "other and further relief as this Court may deem just and appropriate." Complaint, at 15. Courts have explained that a general prayer for relief is more than sufficient to warrant a prejudgment interest award. *Campbell, Athey & Zukowski*, 863 F.2d at 402 (5th Cir. 1989); *Bowers v. Firestone Tire & Rubber Co.*, 800 F.2d 474, 479 (5th Cir. 1986); *North Kansas City v. Sharp*, 414 F.2d 359, 369 (8th Cir. 1969) ("the complaint's prayer concludes with the words 'and for all proper relief.' Clearly, interest qualifies as 'proper relief'").

> **B.  The jury's award of future damages in this case should not be set aside because it need not be reduced to present value.**

Defendant's next assignment of error is that the jury award of up to $266,753 in future damages cannot stand because this amount was not reduced to its present value. Again, Defendant is wrong. Defendant cites two cases in which the Sixth Circuit Court of Appeals held that the failure to instruct the jury regarding reduction of future damages to present value constituted plain error. *See, e.g., Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102 (6th Cir. 1984); *Chonich v. Wayne County Cmty. Coll.*, 874 F.2d 359 (6th Cir. 1989). Defendant fails to acknowledge, however, that shortly after the *Rodgers* decision, the Sixth Circuit clarified that in holding "'it was plain error for the [trial] court not to instruct [the jury] on reducing future damages (loss of income) to present value, . . . the *Rodgers* court did not intend to pronounce an invariable rule of general application." *Kokesh v. American S.S. Co.*, 747 F.2d 1092, 1095-96 (1984). For, "the failure to give such an instruction does not necessarily amount to plain error in every case, but . . . the determination turns on the specific circumstances of the case." *Hawthorne*

*Educ. Servcs., Inc. v. Friedman*, 2000 U.S. App. LEXIS 14069, * 16-17 (6th Cir. 2000) (copy

attached hereto as Exhibit 2).[2]

The *Kokesh* Court further explained that its "reluctance to apply *Rodgers* to the particular

situation before [it was] also motivated in part by [the] need to adhere to the Supreme Court's

analysis in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983) . . . ." *Kokesh*, 747 F.2d

at 1096. In *Laughlin Steel*, "the Court refused to adopt any single rule 'as the exclusive method

in all federal trials for calculating an award for lost earnings in an inflationary economy.'" *Id.*

(citation omitted). Instead, the Supreme Court explained that "one possible approach is to

assume that the market rate of interest is exactly offset by price inflation and productivity gains,

sparing the trier of fact 'the need to cope with inflation estimates, productivity trends, and

present value tables.'" *Id.* (citation omitted). Such an assumption is certainly warranted in the

instant case, as the future damages Teen Challenge will incur span a time period of only one year

(June 30, 2008—the date of the expert report in which the future damages calculation was

rendered—through June 30, 2009). Rather than being forced to "cope with inflation estimates . . .

and present value tables," the jury could reasonably have assumed that the interest its future

damages award would likely earn in one year's time would be offset by the rate of inflation

during that same period. *See Howard v. Chesapeake & Ohio Ry. Co.*, 812 F.2d 282, 287 (6th Cir.

1987) (concluding that the trial court's failure to give the jury a present value instruction was not

plain error where "inflation in projected earnings is 'washed out' by the inflation component of

the interest rate used in present value calculations"), *cert. denied*, 484 U.S. 820 (1987).

---

[2] Indeed, the precise language of the *Chonich* case—cited by Defendant in support of its proposition that the failure
to provide a present value jury instruction <u>always</u> constitutes plain error—demonstrates that no such *per se* rule
exists. *See Chonich v. Wayne County Cmty. Coll.*, 847 F.2d at 369 (holding only that "[t]he failure to instruct the
jury to reduce to present value any . . . loss of future earnings fatally infects *this* jury award" and that "the omission
in *this* case [is] 'plain error'") (emphasis added).

As in *Kokesh*, because the jury's future damages award here "was supported by sufficient proof in the case," *see* Sept. 9, 2008 Tr., pp. 88-89 (Norma Calhoun testified as to various categories in which Plaintiff continued to accrue expenses as a result of Defendant's actions), "and was not shockingly large," there is "no reason to question the jury instructions solely because they did not include a charge on reducing future damages to present worth, an instruction which neither party requested or evidently desired." 747 F.2d at 1096. The court's failure to provide a present value instruction to the jury in these circumstances did not constitute plain error.

Federal Rule of Civil Procedure 51 expressly states that "no party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." While the Sixth Circuit "has made an exception to the principle of non-reviewability [for failure to object to jury instructions in the manner designated by Rule 51]," *see Hawthorne Educ. Servcs.*, 2000 U.S. App. LEXIS 14069, *14-15 (quoting *Reynolds v. Green*, 184 F.3d 589, 594 (6th Cir. 1999)), it has done so only "in cases of 'plain error.'" *Id.* Because this case does not present any such error, however, Defendant's failure to object to the lack of any present value instruction prior to the jury's retirement for deliberation constitutes a waiver of any future objection on that issue.

### C. The evidence presented at trial was more than sufficient to support all of Teen Challenge's theories of damages.

#### 1. Lost Revenue

In the present case, Teen Challenge may have received up to $355,523 for lost revenues.[3]

Defendant objects to this award based upon Teen Challenge's alleged failure to account for

---

[3] Teen Challenge requested damages in the amount of approximately $1.2 million but was only awarded $967,995, thus the jury deducted approximately $240,000 from the amount originally sought by Plaintiff.

certain expenses it alleges Teen Challenge would have incurred as a result of the increase in students. Plaintiff agrees with Defendant that recovery for lost profits must be based on net profits, *Cecil Corley Motor Co., Inc. v. Gen. Motors Corp.*, 380 F. Supp. 819, 854 (M.D. Tenn. 1974), but disagrees with Defendant's assertion that it did not properly account for all expenses. In fact, Plaintiff finds Defendant's allegations to be unfounded and simply not accurate.

In calculating lost revenue, Teen Challenge and its expert subtracted all the expenses it would have incurred as a result of the increase in students including the cost of program materials for each student,[4] and the cost of additional support staff required for the increase in students[5] - information provided to the jury through testimonial and documentary evidence. Pl. Ex. 12. While Teen Challenge considered other costs including utilities, program services, food, equipment, and insurance costs, it concluded that it would not incur *additional* expenses as a result of the increase in students. On direct examination, Teen Challenge's Executive Director explained that one purpose for relocating to the Baker Road property was to consolidate the programs which would have certainly decreased certain operating expenses, including monthly utility costs. Sept. 9, 2008 Tr., p. 71. On cross-examination, Defendant was given the opportunity to explore the reasoning behind Plaintiff's calculations, to which Plaintiff responded with sound explanation – rather than sheer "speculation and guesswork." For example, Ms. Calhoun testified that Teen Challenge's costs for food would not increase significantly because it relies upon the Nashville Table for most of its food and the students also receive food stamps.[6]

---

[4] Sept. 9, 2008, Tr., p. 103 ("we would have ordered additional booklets for them from Teen Challenge. But other than that, we wouldn't have had a lot more supplies, because, as I said, if the students come, they bring like a spiral or just like a regular student would"). *See e.g.*, Sept. 9, 2008, pp. 140 -41, lines; Pl. Ex. 13.

[5] *See* Sept. 9, 2008, Tr., p. 84; p. 140.

[6] Sept. 9, 2008, Tr., p. 105, lines 1-6, 11-15) ("We have a company called the Nashville Table that provides us with a lot of our food . . . Then our students are allowed – because they are in the program and they are considered to be indigent because they have no income, they get a little bit of allowance money for food . . . I anticipate an increase in the need for food, but as long as we're being supplied by these organizations who give it to us . . . they would increase their supply to us." Plaintiff's expert corroborated Ms. Calhoun's explanation. Sept. 9, 2008, Tr., p.140

Ms. Calhoun explained that equipment rental or purchases and maintenance costs would not increase because they would be consolidating their equipment for use at one location.[7]  Ms. Calhoun also testified that utility costs would not increase and, in fact, telephone costs would decrease.  Sept. 9, 2008 Tr., at 101, lines 6-17 (answering "no" to Mr. Young's question as to whether Teen Challenge would also increase costs for such things as telephone lines, and explaining that "the only telephones we would be using would be in the offices because, as I said, they are not available for use outside the office.").  Plaintiff also explained that "just because you have a larger group of people doesn't necessarily mean that you are going to necessarily incur all of the additional expenses, because you consolidate, and you put things together, and you make it more efficient."  Sept. 9, 2008, Tr., p. 114, lines 1-6.  In addition, Ms. Calhoun testified to the increased costs of utilities at their current locations due to the age of the buildings and appliances:

> We were living in older homes . . .probably built in the forties.  And so you know that an older home obviously [has] a much higher maintenance just based on the age of the HVAC or the wiring or the plumbing, et cetera.  And so when you move into a much newer home that has been well [] maintained, the chances of those costs going up are - - - I don't think there would have been a huge increase in that. It think we would have experienced some decrease based on the usage of the new system."

*Id.* at p. 104, lines 11-19.  Finally, Teen Challenge presented evidence to show that any increase in operating would further be offset by money raised by the students.  Ms. Calhoun testified that the students, while enrolled in the program, raise money to cover expenses.  She explained, "students do go to . . . storefronts . . . on Friday and Saturday to like Wal-Mart or K-Mart or

---

(explaining that "other costs we considered was food" and that Teen Challenge received food from two sources free of charge negating the possible increase in food costs).

[7] Sept. 9, 2008, Tr., p. 103, lines 18-25; p. 104, lines 1-3 ("the requirement for having the copiers and the printers and the computers and all of the things that we have, if you have a centralized location and you have all of your files in one location, where right now we have files, we have computers, we have printers, we have copiers, in all those locations.  And so, if you put all those together, you have access to those in a central location, but you don't have to buy more, because you don't have to have them . . . I wouldn't have to buy  more of those in order to spread them out, because they don't have to be spread out").

Kroger . . . and [] get donations from there.  And that, of course, is fundraising.  Depending on how many churches we go to, that's also fundraising, even though it's given as a love offering." Sept. 9, 2008, Tr., p. 105, lines 1-10.

Mr. Entwistle confirmed that Teen Challenge's reliance upon donations and fundraising was reasonable.  Sept. 10, 2008, Tr. 18.  He then explained the various sources of revenue for a nonprofit (as opposed to sources of profit for a corporation), which include "contributions they might receive, grants, and other federal programs that might provide revenue."  *Id*. at 34, lines 8-10.  Mr. Entwistle clarified that this was the reason for considering the mortgage payments "a matter of capital accumulation" rather than a normal operating expense. *Id*. at 13. He confirmed testimony by Ms. Calhoun that Teen Challenge was engaged in a campaign to raise funds to pay off this mortgage debt, *Id*. at 20, and that Teen Challenge had "a history of being able to be debt free" and that "this program would have, over some period of time, been able to accumulate that capital [necessary to pay off the mortgage].  *Id*. at 23.  Most importantly, Mr. Entwistle shared that in his experience in dealing with nonprofits, it is common for an organization the size of Teen Challenge to raise sufficient funds to pay off significant debt."  *Id.*  He further clarified:

> The damage to a nonprofit organization – we can't relate this to a for-profit type of business that's trying to make a profit.  The mission of a nonprofit organization is to produce a community service.  So the measure of damage is the difference between where this organization would have been when they are able to be back in a position where they would have been, had they acquired the Baker Road property, and three years down the line, where would that organization have been.  The damage is where they are today compared to where they could have been on June 30, 2009. Now, that difference, in trying to conclude with respect to damages of events that haven't occurred, and they didn't occur because of the actions of the City, you look at all of the tangible pieces of evidence you can find.  And nonprofit organizations do two things.  They operate their program, and they accumulate capital . . . And the accumulation of capital comes from a number of sources.  Its revenue that they have coming in the door in excess of their expenses, and it has to do with contributions that might come in.

*Id*. at 13-14.

With regard to Mr. Entwistle's classification of mortgage payments as capital, rather than an operating expense, Defendant cites *United States v. West 42nd Street, Hialeah, Fla*., 251 F.3d 1329, 1336 (11th Cir. 2001) which provides that "mortgage payments constitute both an ordinary operating expense – payment of interest – and a capital expense – payment going toward equity." While the court in *Hialeah* concludes that mortgage payments should not be deducted in a case for loss of use of the property, it explains that in a case for loss of property such damages for the "loss of equity from their loss of legal title to the properties" "may be appropriate in a separate action." *Id.*

In spite of the evidence presented at trial regarding the sufficiency of Plaintiff's calculations, Defendant attempts to reconcile the facts in *Cecil Corley Motor Co. v. Gen. Motors Corp.*, 380 F. Supp. 819 (M.D. Tenn. 1974) with those in the present case. In *Cecil*, the court reversed a jury award for lost profits because "the plaintiff failed to show actual damages sustained and failed to establish, with any fair degree of certainty, that it lost sales or net profits during the period in question."[8] In addition, the plaintiff failed to deduct *any* operating expenses from its calculation of lost profits. *Id.*

In contrast, Teen Challenge established with reasonable certainty lost revenue – past and present – and deducted all applicable operating expenses. The fact that much of Plaintiff's testimony regarding operating expenses or rather, the lack of increased operating expense was

---

[8] The Supreme Court, in *Story Parchment Co. v. Paterson Parchment Paper Co*., 282 U.S. 555 (1931) explained with clarity the difference between the burdens of proof necessary to recover lost profits:

> There is a clear distinction between the measure of proof necessary to establish the fact that petition had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

*Id.* at 562.[8] In other words, the burden necessary to establish that damages were suffered is much greater than the burden required to prove the amount of damages. In the *Cecil* case, the plaintiff failed to cross the first threshold.

not accompanied by mathematical precisions does not render the evidence less credible or speculative as Defendant seems to suggest. Courts have made clear that "mathematical precision is not necessary," instead a plaintiff need only "prove lost profits with reasonable or fair certainty." *Cecil*, 380 F. Supp. at 854; s*ee also Hill v. Spiegel, Inc*. 708 F.2d 233, 238 (6th Cir. 1983).

Essentially, Defendant's objection can be reduced to a disagreement on the proper method for the calculation of Teen Challenge's lost revenue which is a far cry from mere "speculation and guesswork." Courts have explained that when competing methods for calculating lost profits are presented, "[i]t is for the jury to determine the correctness of the competing methods employed." *Diamond Coal Co. v. United Mine Workers of Am*., 436 F.2d 551, 561 (6th Cir. 1970). In *Diamond Coal Company* (a case cited by Defendant) the Court upheld a jury award where a loss of profits was shown with "reasonable certainty" but where there was a dispute as to the *actual amount* of lost profits suffered. Both parties presented their own C.P.A. expert – each of whom testified as to a different method for the proper calculation of lost profits. *Id*. at 560. The Defendant's expert presented a calculation which resulted in a much lower total in lost profits than that reached by the Plaintiff's expert. In upholding the jury award based upon the method presented by Plaintiff's expert, the court stated: "It has long been recognized that once the fact of damage[s] has been properly shown, 'uncertainty as to their amount will not foreclose recovery.'" *Id*. at 561 (citations omitted).

In the present case, Plaintiff has established with reasonable certainty that it suffered lost revenue. The parties' disagreement as to the method for determining those damages does not render such an award unrecoverable, but is instead, an issue for the jury to decide.

## 2. **Lost revenue for 28 additional students.**

Defendant also contends that the revenue award lacks "evidentiary support" because the facts relied upon by plaintiff's expert were contradicted by testimony of Ms. Calhoun. Def. Mot. For Judg. As Matter of Law, at 14 ("the . . . award . . . is based on 28 additional students, not 16").[9] Defendant's argument is unsupported by case law and by the evidence. At trial, Plaintiff's expert testified that he based his calculation of lost revenue on "an increase of 18 male and 10 female students" – information provided to him by Ms. Calhoun. Sept. 9, 2008, Tr. at p. 129, lines 17-20. Ms. Calhoun verified the accuracy of the expert's calculations, explaining that she provided Mr. Entwistle with the information on which he based his report. *Id*. at p. 84, lines 3-20. She also testified that the information contained in Mr. Entwistle's report was accurate. *Id.* She further testified that she had read Mr. Entwistle's report and agreed with all of his calculations. *Id*. at p. 88, lines 15-19.[10] Pursuant to Federal Rule of Evidence 703, an expert witness is permitted to rely upon information supplied by Plaintiff prior to trial. ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing"). FRE 703. The rule merely requires that such information be "of a type reasonably relied upon by experts in the particular field." *Id*. Defendant did not challenge or object to the basis for Mr. Entwistle's calculations.

---

[9] Defendant's citation to *Brooke v. Group Ltd. v. Brown & Willimson Tobacco Corp*., 509 U.S. 209, 242 (1993) is irrelevant in the present case since the record does not present "**indisputable** facts" which contradict the expert's opinion."

[10] "Q. Have you, at my request, provided a copy . . . of [to] the expert who is later to testify, all of the documentation of those expenses? A. I have. Q. . . . we have bound in Collective Exhibit 12 a complete copy of all of the invoices and documentation about the various categories of expenses . . .at this point all I'm asking of you, Ms. Calhoun, is to look at that and identify it. Tell us what is it, please. A. Its validation of the expenses that we submitted. They were all submitted with invoices or statements. There was not one submitted that was not verified by documentation that they were actual expenses. It was money that we had to spend. Q. . . . and have all of those been provided to the expert who is later to testify? A. That's correct." Tr., p. 84, lines 3-20. See e.g., Tr., p. 88, lines 15-19 ("Q. And again, you have reviewed the report that has been provided by Mr. Entwistle? A. Yes sir; I have. Q. Do you agree with his calculations as to those? A. Definitely; yes, sir.").

Thus, sufficient evidence that Teen Challenge planned to expand its program to include 28 additional students was presented.

Nonetheless, Defendant's cites to testimony provided by Ms. Calhoun on cross examination that Teen Challenge planned to move 18 men onto the property and 16 women, for a total of 16 new students. Sept. 9, 2008, Tr., p. 97, lines 1-25. This portion of the testimony cited by Defendant, however, includes the following statement by Ms. Calhoun: "Again, I've run through so many numbers, I'm trying to make sure I give you the correct answer. We had capacity for 12, and we – I think – maybe – maybe it was a few more than that, Mr. Young." *Id.* at 97, lines 14-18. Mr. Young then questions Ms. Calhoun two more times regarding the total number of additional students, to which Ms. Calhoun consistently responds that she "could be wrong on that number, because I'm just trying to recall what we had" and "[t]hat's getting pretty close, but again, forgive me if I have missed on that one number of the men." *Id.* at 99, lines 11-14. Thus, the testimony when considered in its entirety supports Plaintiff's expert's original calculation of lost revenues based upon plans to expand its program to include 28 additional students and complies with the requirements of Fed. R. Civ. P. 703.

Defendant's objection to the alleged inconsistent testimony is also without merit pursuant to applicable case law. Conflicting testimony at trial poses no problem since the jury is the factfinder. *Engesbretsen v. Fairchild Aircraft Corp.,* 21 F.3d 721, 726 (6th Cir. 1994) (commenting on the discrepancy between two conflicting testimonies and explaining that the resolution of such conflicts in testimony is a question for the jury). *See e.g., Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.,* 533 F.2d 510, 518 (10th Cir. Utah 1976). In *Nissan Motor Corporation*, the court was presented with a similar objection to a jury award for lost profits. Like Defendant in the present case, Nissan cited the *Cecil* case in support, which the court

rejected. The plaintiff's expert calculated damages beginning in 1970 assuming that the discriminatory allocation began at that time, but the plaintiff testified that the discrimination did not begin until 1971. *Id*. The Court upheld the award explaining that "the jury having heard both pieces of testimony, was in a position to determine which was the more credible and to assess damages accordingly. *Id*.

### 3. Additional transportation costs and personnel costs.

Defendant's objections to the jury awards for additional transportation and personnel costs caused by Plaintiff's inability to consolidate its operations at the Baker Road property are also without merit. Defendant claims that "there is no substantive proof in the record" to support these theories of recovery. Mot. for Judg. as Matter of Law, at 17-18. To the contrary, ample evidence—both documentary and testimonial in nature—was introduced by Plaintiff as to its additional transportation and personnel costs.

Regarding the travel that has been necessitated as a result of Defendant's actions, Norma Calhoun, Executive Director of Teen Challenge, testified that the female students:

> go from where they are in the morning [their housing] to the school, . . . and then they are transported back. And then the men are housed in another part of town, and we transport them to another church called Belmont Church, and they have their classes there, and then they go back home. And then our corporate office is in Hendersonville. And it's required for us to obviously be with the students for various reasons, and so we go from Hendersonville to 37th or Hendersonville to Brierville, or Hendersonville to one of the churches . . . .

Sept. 9, 2008 Tr., pp. 70-71. Thus, Ms. Calhoun's testimony contained the essential facts demonstrating the additional travel that has been required of Plaintiff. The specific locations and the distances between them were then introduced in Plaintiff's Collective Exhibit 12, in which Plaintiff provided the jury with mileage maps. See Pl. Ex. 12, Tab 4. Furthermore, Exhibit 12, which Ms. Calhoun identified as "the validation of the expenses that [Plaintiff] submitted," Sept.

9, 2008 Tr., p. 84, includes specific and extensive documentation regarding Plaintiff's additional travel expenses. See Pl. Ex. 12, Tab 4 (catalog of vehicle maintenance expenses and fuel charges necessitated by additional travel). No more is required of Plaintiff. *See Hill*, 708 F.2d at 238 ("Once the existence of damages is shown with reasonable certainty, 'the precise amount is necessarily left to the discretion of the finder of fact, to be exercised reasonably and within the range of the proofs in the case'") (citations omitted).

Likewise, regarding its additional personnel costs, Plaintiff introduced not only documentation of the salaries of those employees whose time was occupied in travel between Plaintiff's various locations, see Pl. Ex. 12, Tab 5, but also testimony by Ms. Calhoun regarding the continued need for employees to travel "back and forth between all of these locations, as well as spending . . . extra time in between the February date [on which Defendant passed the offending ordinance] and the June date [on which Plaintiff subsequently sold the Baker Road property] trying to get everything ready for selling the house, and then making other arrangements to keep the students housed where they were." Sept.9, 2008 Tr., pp. 87-88.

Defendant again takes issue with the fact that Ms. Calhoun did not testify from the witness stand as to specific calculations of the damages incurred in these two categories; however, Ms. Calhoun clearly testified that she had provided Plaintiff's expert with all of the relevant documentation and information from which he determined the damages calculations, *see id*. at p. 84 (Ms. Calhoun testifying that all of Plaintiff's expenses were "submitted [to the expert] with invoices or statements"), she viewed the entire document detailing "all of the individual categories" of damages contained in the expert report, and she "agree[d] with his calculations as to those[.]" *Id*. at p. 88. Thus, Plaintiff met its burden of showing the existence of additional transportation and personnel damages with reasonable certainty. Consequently, as the Sixth

Circuit has cautioned, "the precise amount is necessarily left to the finder of fact[.]" *Hill v. Spiegel, Inc.,* 708 F.2d at 238.

While Defendant is correct that "expert testimony may not be used to establish underlying facts not otherwise in evidence," *Adell v. John Richards Homes Building Co*., 439 F.3d 248, 264 (6th Cir. 2006), as demonstrated above, Plaintiff here introduced the underlying facts regarding its transportation and personnel damages through both the testimony of Ms. Calhoun and documentary evidence. To be sure, the testimony of Plaintiff's expert regarding the precise amount of damages was based in part on information supplied by Plaintiff prior to trial. As Plaintiff explained earlier, however, Federal Rule of Evidence 703, expressly permits expert witnesses to rely on such sources: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." FRE 703 (emphasis added). The rule merely requires that such information be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* At no time during trial did Defendant make any objection under Rule 703 as to the facts or data underlying Mr. Entwistle's testimony.

Furthermore, as the *Adell* court explained,

> Federal Rule of Evidence 705 expressly contemplates that an expert may offer an opinion without the record containing all of the underlying facts on which that opinion is based: 'The expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.' FRE 705. Thus, an opposing party who would challenge the facts underlying the expert's opinion must do so by cross-examination.

*Adell*, 439 F.3d at 264 (citing *Smith v. Ford Motor Co*., 626 F.2d 784, 793 (10th Cir. 1980) (holding that the effect of Rules 703 and 705 is to "place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of

17

opposing counsel's cross examination"). Just as Defendant made no Rule 703 objection at trial, neither did it make any attempt to "explor[e] . . . the facts and assumptions underlying [Mr. Entwistle's] testimony" on cross examination.

Based on the foregoing, Defendant's contention that the evidence does not support the jury's awards for additional transportation and personnel costs fails as there are "sufficient facts already in evidence [and] disclosed by the [expert] witness as a result of his investigation to take the testimony out of the realm of guesswork and speculation." *Polk v. Ford Motor Co.*, 529 F.2d 259 (8th Cir. 1976), cert. denied, 426 U.S. 907 (1976) (cited with approval by *Calhoun v. Honda Motor Company*, 738 F.2d 126, 132 (6th Cir. 1984)). Furthermore, the jury was entitled to give to Mr. Entwistle's unobjected testimony the weight it deemed appropriate without access to all of the information on which his testimony was based. Defendant's opportunity to challenge the facts and bases underlying that testimony has passed.

### 4.  Costs for replacement property.

Defendant's last objection relates to the jury's possible award up to $400,000 for costs of acquiring a replacement property.[11]  Defendant cites to *Siegmond v. Fedor*, 2004 WL 1490430 (M.D. Pa. June 29, 2004) to support the assertion that Plaintiff's listed cost for acquiring a replacement property constitutes a "windfall" because "damages may properly be measured by the value of the loss of use of property" and Teen Challenge has already recovered lost revenues. Mot. For Judg. as Matter of Law, at 18.  Defendant's single citation to the *Siegmond* case merely provides one example of the type of damages recoverable and does not support the assertion that damages are limited to loss of use of the property.  Additionally, the *Siegmond* case does not provide a correct comparison since the plaintiff in *Siegmond* was not forced to sell its property as

---

[11] As already stated, plaintiff requested damages in the amount of $1.2 million dollars but was only awarded $967,995.

a result of the government's actions and, thus, such damages were never considered by the court. *Siegmond*, 2004 WL 1490430, at *1-2.

Pursuant to 42 U.S.C. § 1983, a plaintiff is entitled to a sum of money "that will justly and fairly compensate them for any injury suffered." *Baumbardner v. Secretary, United States Dep't of Houses & Urban Dev.*, 960 F.2d 575, 582 (6th Cir. 1992) ("compensatory damages may include . . . out-of-pocket loss and other monetary harms." (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)).

In the present case, the jury's award for lost revenue does not restore Teen Challenge to the place it would have been, but for Defendant's actions. Teen Challenge not only lost past and future revenues, but was forced to sell the property after the government passed the ordinance preventing them from obtaining zoning approval. But for the government's actions, Teen Challenge would have a new home on Baker Road – negating the need for finding a suitable property.

Defendant further objects to Teen Challenge's damages for a replacement property on the basis that such damages are mere "speculation." Such an assertion is not supported by the evidence. Plaintiff provided the jury with testimonial and documentary evidence to support its calculations for the cost of acquiring a replacement.[12] Specifically, Plaintiff provided the jury with official MLS listings for each suitable property it had located. Pl. Ex. 12, Tab 7. In calculating the exact replacement cost, Plaintiff's expert took into account the extensive repairs needed on the Baker Road property, as well as those that would be required for the comparable properties, deducting the expenses from the listed sales price in order to provide a fair and reasonable replacement cost by taking into account all factors. Pl. Ex. 13, 9-10; Sept. 9, 2008,

---

[12] As already explained in the paragraphs above, Plaintiff submitted Collective Exhibit 12 which documented with particularity the damages suffered by Teen Challenge. Tab 7 of Collective Exhibit 12 contains the various MLS listings reviewed by Teen Challenge in its search for comparable property. *See e.g.*, Pl. Ex. 13, pp. 9-11.

Tr. p. 140-148. Plaintiff's expert also explained that these properties were the only ones suitable for Teen Challenge's planned use and that such properties were extremely hard to locate. Pl. Ex. 13, p. 9 ("finding the property that meets the needs of Teen Challenge is difficult to accomplish . . . property zoned with the number of bedroom/bathrooms required by Teen Challenge, with the ability to separate the male from the female students . . . was quite rare"). Importantly, Mr. Entwistle confirmed that such a procedure – reliance upon a real estate agent or other individuals for the appropriate calculations related to real estate and repairs – was the type of information "reasonably relied upon by experts in his field." *See* FED. R. CIV. P. 703 ("providing that the facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing" as long as such information is "of a type reasonably relied upon by experts in the particular filed in forming opinions or inferences"). As this Court properly noted, Defendant failed to present evidence to the contrary – that such facts or information are not normally relied upon by a CPA in preparing similar calculations. Sept. 9, 2008, Tr., p. 148-152.

Defendant's only evidence contradicting this category of damages was the fact that the Baker Road property might be back on the market. As an initial matter, there is absolutely no evidence in the record demonstrating this allegation to be true. Defendant's counsel merely asked whether Ms. Calhoun was aware that *a portion* of that property was on the market again, to which Ms. Calhoun responded that she had heard statements to that effect but had no personal knowledge of that fact. Thus, based on defense counsel's own information, the property would not be suitable for Plaintiff's needs. Furthermore, Plaintiff disputed Defendant's alleged "suitability" of the Baker Road property in its current state, explaining that Teen Challenge could not move back on the property due to "tremendous opposition" from neighbors and the events

that had transpired during Teen Challenge's attempts to maintain zoning approval. Sept. 9, 2008, Tr., p. 86, lines 7-11, 17-20.

Thus, as Plaintiff has previously explained, the evidence presented at trial established with reasonable certainty the costs for acquiring a replacement property. *See Cecil*, 380 F. Supp. at 854 ("mathematical precision is not necessary"). Plaintiff's calculation is not "speculative" merely because Defendant attempted to demonstrate some conflict among the evidence presented. *Diamond Coal Co.*, 436 F.2d at 560-61.

## CONCLUSION

In the present case, there is nothing about the jury's award which "shocks the conscience." Plaintiff presented sufficient evidence to support more than the $967,995 actually awarded. The jury verdict did not exceed the maximum damages that it could have reasonably found to be compensatory for Teen Challenge's loss and, thus, should not be set aside according to Sixth Circuit law. *Farber*, 917 F.2d at 1395. Based upon the foregoing reasoning and authorities, Plaintiff respectfully requests that this Court deny Defendant's requested relief.

Respectfully Submitted,

s/Larry Crain
LARRY L. CRAIN, BPR # 9040
ABIGAIL SOUTHERLAND, BPR # 26608
CARLY GAMMILL, BPR #74903
AMERICAN CENTER FOR LAW AND JUSTICE
5214 Maryland Way, Suite 402
Brentwood, TN  37027
(615) 376-2600
Lcrain@brentwoodlaw.com
*Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October, 2008, a copy of this foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

Francis H. Young, #16554
James W.J. Farrar, #22782
Assistant Metropolitan Attorneys
P.O. Box 196300
Nashville, TN 37219-6300
615-863-6341

s/Larry Crain